# THOMAS P. KURT

### ATTORNEY AT LAW

PHONE: (419) 241-5506
FAX: (419) 243-4920
———

610 ADAMS ST.
TOLEDO, OHIO 43604
*thomaskurt.law@gmail.com*

January 8, 2008

ADMITTED TO PRACTICE IN
OHIO, MICHIGAN, AND
FEDERAL COURTS

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 615
New York, NY 10007

Re: <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

Dear Judge Sullivan:

Mr. Archer is scheduled to be sentenced by you on January 16, at 11:00. I have filed a formal Sentencing Memorandum which discusses the legal parameter's of the district court's sentencing discretion, and which proposes a sentence for Mr. Archer. Given the recent holding of the Supreme Court in *Gall v. United States*, it is very clear that this court has tremendous discretion to fashion its sentence, so long as the court in some manner demonstrates its consideration of the factors set forth in 28 U.S.C. § 3553.

At the outset, I thank the court for admitting me to practice before the Southern District of New York in this matter on a *pro hac vice* basis, and to represent Mr. Archer.

I was initially appointed by Magistrate Judge Verne Armstrong to represent Mr. Archer in the Northern District of Ohio for purposes of his Rule 5 hearing, pursuant to the Criminal Justice Act. Mr. Archer was extremely distraught at the time of his initial appearance in Toledo, and it was apparent to me that he would face great difficulty with the legal and travel logistics in appearing before this court in New York City. I believe that Mr. Archer appreciated my patience and concern in this regard, and he asked that I represent him through the remainder of the proceedings on a retained basis.

In the process of this representation I have met with Mr. Archer in my office on six separate occasions, and of course have spent several hours with him on flights to and from New York City for court appearances. As a result of those

(cont'd)

# THOMAS P. KURT
## ATTORNEY AT LAW
___

January 8, 2008

Hon. Richard J. Sullivan
United States District Court
Southern District of New York

Re:  <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

- Page 2 -

meetings and travel, communications from family members, and
the input of two mental health professionals, I believe that
I have a good understanding of Mr. Archer's character and
attitude.  I hope to express this understanding to the court
for its benefit in the sentencing process.

Marilyn Logsdon, a social worker in nearby Bowling Green,
Ohio, has been meeting with Mr. Archer on a weekly basis
since his arrest.  Ms. Logsdon's role, as I understand it,
has been to assist Mr. Archer with adjusting to the personal
crisis brought about by this criminal case.  The court will
see that Ms. Logsdon was concerned, early on, that Mr. Archer
was at risk of suicidal behavior.  With Ms. Logsdon's help
and the help of medication, it appears that Mr. Archer has
stabilized to the point that the risk of suicide is no longer
a clinical concern.

Nonetheless, I believe that the emotional near-collapse which
Ms. Logsdon initially observed in Mr. Archer was at least in
part the result of Mr. Archer's shame and regret concerning
his behavior.  The charged behavior was in absolute contrast
and opposition to the personal values and morals which Archer
appears to have practiced for the first nearly 60 years of
his life.

Certainly, Archer's reaction was in part due to his concern
for his personal well-being vis-à-vis the possibility of
imprisonment.  However, in my discussions with him, Mr.
Archer's greatest concerns have been for the well-being of
his wife, whom he regards as almost completely dependent upon
him, and the shame which he has brought to himself and his
family.  I am convinced by his expression and demeanor that
these concerns for his family - and his sense of shame - are
completely sincere.

                    (cont'd)

# THOMAS P. KURT
## ATTORNEY AT LAW
____

January 8, 2008

Hon. Richard J. Sullivan
United States District Court
Southern District of New York

Re:  <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

- Page 3 -

I could go on, but I hope it will suffice for me to say that
Mr. Archer appears to be nearly personally destroyed as a
result of his transgression.  He seems altogether unable to
place this crisis in any sort of overriding context, nor is
he yet able to fathom that his family will forgive him and
continue to accept him.

Although I hope that the court will take Mr. Archer's turmoil
into account as a very significant factor in determining his
sentence, I understand that the court must look at other
considerations as well.

I suspect that one of the court's foremost considerations
will be the question of why Mr. Archer engaged in this
conduct, and what his ultimate intentions were.

With regard to the first question, the best answer which I
can offer, is that Mr. Archer developed an unhealthy
curiosity about sexual images - most of which were likely
distasteful but only a minority of which were illegal - which
he viewed on the internet shortly after his retirement from
30 years at the same job.

I should point out to the court that the forensic examination
of his computer by law enforcement officials revealed not
just the one hundred or so images of illegal child
pornography which are the subject of this case, but over
1,400 images of all types of adult pornography.

In view of this, I submit that Archer may be regarded as
emotionally immature in his overall conceptualization of
sexuality, but I believe that he is not sexually attracted to
children.

The images of child pornography which were seized from Mr.
Archer's computer had been voluntarily deleted by him
sometime prior to his arrest, but were "undeleted" by the
forensic examiner.

(cont'd)

# Thomas P. Kurt

### ATTORNEY AT LAW

———

January 8, 2008

Hon. Richard J. Sullivan
United States District Court
Southern District of New York

Re:  <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

- Page 4 -

Further, a complete search of Mr. Archer's home uncovered
absolutely no evidence of child pornography other than that
recovered from his computer, and which, as noted above, had
been deleted by him.

One of the investigators in this case provided an affidavit
in support of the search warrant for Mr. Archer's home which
explained that, based on her experience and training, an
individual with a sexual attraction to children will amass
significant amounts of child pornography and will go to great
lengths to preserve that collection.  Using those statements
as a guide, the results of the search of Archer's home and
computer were not consistent with what would be expected of
an individual with an ongoing sexual attraction to children.

Turning to the second question, this court no doubt has
additional concern about the statements made online by Mr.
Archer to a purported 14-year old female (in actuality the
undercover detective), and Mr. Archer's ultimate intentions.
Mr. Archer did, as the probation department's report states,
make highly inappropriate sexual comments.  He did not,
however, make any attempt whatsoever to meet with the
purported teenager, or attempt to initiate any further
contact with the purported teenager.

A review of the online communication between Mr. Archer and
the undercover detective suggests that the officer pointedly
kept the communication going, obviously for the purpose of
discerning whether Archer would attempt to engage in criminal
sexual behavior with a juvenile.  Beyond his dissemination of
the illegal images which are the subject of this prosecution,
Archer in fact did not engage, or attempt to engage, in any
such conduct.

(cont'd)

# THOMAS P. KURT
## ATTORNEY AT LAW
———

January 8, 2008

Hon. Richard J. Sullivan
United States District Court
Southern District of New York

Re:  <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

- Page 5 -

Accordingly, this court should be satisfied that Mr. Archer
had no intent to physically/sexually abuse the purported
female, or any other child or teenager.  This is consistent
with the limited extent of Archer's online communications,
consistent with the relatively small amount of child
pornography seized from his computer, consistent with the
fact that the limited amount of child pornography which was
recovered had been voluntarily deleted, and consistent with
the fact that the vast majority of the pornography which was
recovered from Archer's computer was adult pornography.

I am also submitting to the court the report of Gregory
Forgac, PhD, a psychologist who met with Mr. Archer for over
two hours and administered a Minnesota Multiphasic
Personality Inventory.  The bottom line of Dr. Forgac's
findings is that Mr. Archer presents a very low risk of
recidivism.

Based on all of this, I submit that Mr. Archer's actions
reflect a terrible mistake of judgment, but do not serve to
raise any inherent concern that he is a "pedophile" or
otherwise a danger to the community.

Your honor, any lengthy prison sentence will cause grievous
harm to Mr. Archer's family, in particular his elderly wife.
The reports and letters before you describe Thora Archer as
heavily dependent on Mr. Archer for emotional and physical
support.  I have met with Mrs. Archer, and those descriptions
are accurate and true.

I submit to you that the only reason for a lengthy prison
sentence - indeed the only reason that the guidelines suggest
a lengthy sentence - is to communicate the very serious

(cont'd)

# THOMAS P. KURT
### ATTORNEY AT LAW
———

January 8, 2008

Hon. Richard J. Sullivan
United States District Court
Southern District of New York

Re:  <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

- Page 6 -

nature of child pornography offenses and the harm that such
materials cause to the depicted children and to society in
general.  And I certainly do not disagree, in the abstract,
with that consideration.

But I submit to you that the federal courts will have many
opportunities, unfortunately, to fashion sentences which meet
that goal.  There are many cases involving child pornography
in which a lengthy prison sentence is justified both by the
nature of the charges, and by the individual characteristics
of the defendant.

I submit that it is not necessary, in meeting that goal, to
impose a severe prison sentence in this particular case.

At bottom, this is a case in which a lengthy prison sentence
would do far more damage to Mr. Archer's family than could
possibly be justified, even taking into account the serious
nature of the charge.

I am including with this submission letters from Mr. Archer's
wife, his three grown children, and a church leader.  All of
these letters depict Mr. Archer as a loving father,
grandfather, and spouse.  Despite the ugly nature of the
charges in this case, each of these individuals have forgiven
Mr. Archer and have attested to his trustworthy and good
character.

Finally, also included is a letter from Mr. Archer himself.
I hope that you will sense the level of Timothy Archer's
sense of shame, remorse, and quite frankly, desperation.

Please give any and all possible consideration to the
sentence proposed in defendants' Sentencing Memorandum, which
is about as much as Mr. Archer and his family can tolerate.

(cont'd)

# THOMAS P. KURT
## ATTORNEY AT LAW
——

January 9, 2008

Hon. Richard J. Sullivan
United States District Court
Southern District of New York

Re:  <u>United States v. Timothy Archer</u>, no. 07-CR-0757, SDNY

- Page 7 -

Thank you.

Very truly yours,

Thomas P. Kurt

cc: Michael Rosensaft, AUSA (via ECF system)

enclosures:

1.  Letter report from Marilyn Logsdon, LPCC, to Robin
    Lafferty, U.S. Pre-Trial Services [NDO], dated
    05/09/2007 (4 pp)

2.  Report of Gregory E. Forgac, Ph.D., dated 01/02/2008 (9
    pp)

3.  Letter, To Whom it May Concern, from William P. Harmon
    (lifelong friend), Findlay, Ohio, dated 12/12/2007 (3
    pp)

4.  Letter, Dear Sir, from Thora Archer (wife), Findlay,
    Ohio, undated (4 pp)

5.  Letter, To Whom it May Concern, from Melissa Ann Cross
    (daughter), North Baltimore, Ohio, 12/13/2007 (3 pp)

6.  Letter, (no salutation), from Matt Archer (son), North
    Baltimore, Ohio, undated (2 pp)

7.  Letter, (no salutation), from Tim J. Archer, Jr., (son),
    undated (2 pp)

8.  Letter, To Whom it May Concern, from defendant Timothy
    Archer, Sr., undated (3 pp)

Maralyn L. Logsdon, LPCC
PO Box 434
136 ½ S. Main St.
Bowling Green, OH   43402
419-352-3036

May 9, 2007
Mental Health Assessment

Client Name:  Timothy Archer

Prepared By:  Maralyn L. Logsdon, LPCC

Submitted To:  Robin Lafferty
               U.S. Pre-Trial Services

     This is based on several hours of clinical interviews and MMPI-2 test results. Mr. Archer is a sixty year old Caucasian male. He was cooperative about scheduling appointments and arrived in a timely manner. Mr. Archer was in serious emotional distress during each of four sessions, such that he was asked each time about suicidal ideation and/or planning. Mr Archer is filled with fear, anguish, guilt and remorse. Many times it was necessary to stop the assessment in order to help Mr. Archer regain stability. He was open and involved in his responses and readily and willingly participated. Mr. Archer would probably be considered of average intelligence with a narrow and conventional range of interests.

     Mr. Archer was born on December 13th, 1946 and grew up in the small, rural town of North Baltimore, Ohio. He is the middle child of three sons. One of his brothers is thirteen months older and one is nine years younger. Dad worked for the railroad and mom in a factory. Tim's early memories are of being very shy. His parents argued a lot. His dad was a hard worker, quiet and the traditional head of the house. His mom was a good mom, liked to dress the two brothers as twins and was cheerful. Tim felt closest to his mom. Tim liked riding bikes, roller skating and playing sports in the neighborhood. In school, Tim was an above average student and although shy, had several friends. He didn't like being in front of people and some people thought he was "stuck up".

     Mr. Archer's life changed radically when he was in fourth grade. Shortly after having her third son, his mom had a "nervous breakdown" and was taken by ambulance to Toledo Mental Hospital. Tim remembers going there to visit and being very scared. Dad started working two jobs in order to pay the medical bills and the older boys started a paper route. The children stayed a lot with their paternal grandparents and Tim became close to his grandmother. His mom was in and out of the hospital throughout the rest of his childhood. Mom would be home for awhile and then begin hallucinating and talking irrationally and be taken back to the hospital. Tim's family weren't ones to talk about things so he didn't know what was wrong with her other than overhearing people say she was "sick" and "not right". Only as an adult would he learn that she had schizophrenia.



2

In Junior High and High School Tim was even more quiet and shy. He was an average student and liked mathematics. He attended dances and sporting events with his friends. While he liked being with his friends and got along well with everybody else, he didn't date as he was too shy to ask girls out. He experimented a little with alcohol but not with drugs.

Mr. Archer graduated from high School in 1964. At age seventeen, he joined the navy, fearing he would get drafted. He didn't like the navy because he thought it was a very negative environment and also he suffered from motion sickness. Even though he didn't like it, he go along well with everyone, didn't have any trouble and was honorably discharged after he served his time. While stationed in Rhode Island, he went on a blind date and met Thora, his future wife. She was also very shy and they got along well. This was a first and only love for both of them. Tim had no plans for the rest of his life and didn't plan to marry. However, when Thora became pregnant they got married. He was twenty at the time.

In December of 1967, Tim was discharged from the military and he and Thora returned to North Baltimore. His parents had divorced and his mom had moved to California where she had family. Tim and Thora rented an upstairs apartment three doors down from his dad and Tim went to work at the Whirlpool factory in Findlay, Ohio where he worked for 39 years. In 1968, Tim Jr. was born, followed by Melissa and then Matthew, all about a year apart. After about five years they were able to use FHA money and build a small ranch home, where they lived for 21 years. Mr. Archer and his wife had a very conventional family-oriented life. They were very active with the children and the church but didn't do a lot outside of the family. Mr. Archer was the traditional head of household, making all the decisions, in charge of finances, spending all their time together etc. Their family didn't talk about things much, just like both of their original families. While in his twenties, Tim did go to college nights and earned an associates degree in business from Tiffin University in 1978. He attributes this experience to being a little more outgoing than his wife.

In the early 1980's, Tim and Thora helped found a church in North Baltimore called The Christian Missionary and Alliance. The whole family participated until around 1993 when church politics became overwhelming. In 1994, with kids grown, Time and Thora decided to move to Findlay to a mobile home park. They thought they could save some money and it would be better for just the two of them. Their kids and six grandkids (ages 9-15) still live in North Baltimore which is only ten miles away. Tim and Thora are both retired and spend all their time together and with family. They have only been apart for one week in their 40 year marriage.

Mr. Archer has never had issues with alcohol or drugs. He will occasionally (less than once a month) drink 1-2 beers. Though he is quiet and shy, he generally gets along with others. He has had no previous legal problems and completed successful employment at the same place for 39 years. As previously mentioned, he and his wife generally keep to themselves with few outside interests other than being very involved in their children and grandchildren's activities.

About two years ago, Mr. Archer and his wife stopped having physical relations. Since they don't discuss things, he is not sure what happened other than his advances were not

3

accepted. He began spending more and more time on the internet in chat rooms. From there he learned that other kinds of stimulation was available and began viewing and trading adult pornography. This more recently became other things which led to his arrest. Mr. Archer cannot explain his behavior other than to say that he got "lost" in a fantasy world of cyberspace. He did not examine his behavior until he realized he was doing something horribly wrong and stopped his actions. Though he became aware that it was wrong, he never thought of it as "real" only a fantasy.

Mr. Archer's MMPI-2 test results were somewhat inconsistent with results from several hours of clinical interviews. This can be explained by his lack of any experience in identifying or understanding his emotions. He can best be described by his own words that he is a simple man who enjoys his simple life with his family. He has always followed the rules, tried to get along with everyone and to be friendly and help others. He is rigid and conventional in his thinking and actions. He has a very narrow range of interests involving church, family and work.

Mr. Archer presents clinically as a person whose life has been shattered. He is filled with fear and anxiety and cries throughout conversations. He is racked with guilt and shame for his behavior. He appears to be in a daze. He has difficulty concentrating, focusing on anything but his incident and sleeping. He is plagued with worry about what will happen to his wife and with the pain and suffering he has caused her. He is quite traumatized and confused. He is actively involved in the therapeutic process in a sincere attempt to understand his emotions, and his behavior and to learn to communicate with his wife and others.

In summary, Mr. Archer is a very confused person who has been traumatized by the consequences of his behavior. His life is shattered and it will take significant intervention for him to be able to understand and deal successfully with his behavior and emotions. He is filled with fear, guilt and shame. For someone who has lived sixty years doing what he has believed to be the right thing his involvement in the present situation is close to being emotionally unbearable and life threatening. Mr. Archer has, however, responded quite openly and positively to therapy. While he is most certainly quite fragile, it is believed that he can be successfully treated with psychotherapy to restore an integrated sense of self and a more balanced life.

4

## DIAGNOSTIC IMPRESSIONS (DSM-IV-TR)

| | | |
|---|---|---|
| Axis I: | 300.4 | R/O Dysthymic Disorder |
| | 309.81 | Post Traumatic Stress Disorder Acute |
| Axis II | 799.9 | Deferred |
| Axis III | | None |
| Axis IV | | Legal Issues |
| Axis V | | Gaf : 45 |

Please feel free to contact my office with questions or concerns at (419) 352-3036.

Respectfully Submitted,

*M Logsdon, LPCCs*

Maralyn L. Logsdon
Licensed Professional
Clinical Counselor
Supervisor

# GREGORY E. FORGAC, Ph.D.
### Clinical Psychologist

Sunforest Medical Building
3900 Sunforest Ct., Ste. 200
Toledo, Ohio  43623
Telephone:  (419) 474-4471

January 2, 2008

RE:    Timothy Archer, dob: 12/13/1946
       Dates of Evaluation:  11/06/2007 and 11/19/2007
       Docket Number:  07 CR 757-01(RJS)

## REASON FOR EVALUATION REFERRAL:

Timothy Archer was referred to my office for this evaluation by his attorney, Mr. Thomas Kurt, Esq.  He was referred for a presentence psychological evaluation to address the issue of sex offender risk.  He is currently in presentence status before the United States District Court Southern District of New York on charges of Possession of Child Pornography Transported in Interstate or Foreign Commerce (Class C Felony) and Transfer of Obscene Materials to Minors (Class C Felony).

## DESCRIPTION AND EVALUATION PROCEDURE

Timothy Archer was seen for this evaluation here in my office at the Sunforest Medical Building.  He is a 61 year old, married, Caucasian male, who stands 5'9" tall and who weighs approximately 145 pounds.  Mr. Archer has grey hair and was wearing eye glasses.  During both interviews, he was casually, but appropriately, attired and his appearance was neat and clean.  Prior to beginning this evaluation, its purpose and lack of confidentiality inherent in the evaluation procedure were explained to Mr. Archer, which he appeared to understand and accept, so the evaluation continued.  He had signed the release of information form allowing me to provide his attorney, Thomas P. Kurt, with a copy of this report.  In order to complete this evaluation, I spent over 2 hours in direct clinical contact with Mr. Archer and the Minnesota Multiphasic Personality Inventory -2 (MMPI-2) was administered to him.  I also scored the Static 99, using information regarding Mr. Archer.  This man had also completed a health assessment form.

Prior to completing this evaluation, I reviewed information provided by Mr. Kurt, including: a Federal Probation Office Presentence Investigation Report; a Mental Health Assessment completed by Maralyn L. Logsdon, Licensed Professional Clinical Counselor; and finally a referral letter written by Attorney Thomas P. Kurt.

ENTERED JAN 0 7 2008

Page 2
January 2, 2008

## REPORTED SOCIAL HISTORY

Mr. Archer was born in Findlay, Ohio, and grew up in North Baltimore, Ohio. He grew up with his natural parents. Regarding his relationship with his mother, he stated "She got sick, mentally ill. When I was 10 years old, they took her away. She was in and out of psych hospitals. She is in California now. I don't know where. In a nursing home now. She heard voices." He reported getting along with her "okay" and reported that at one time she had done some factory work. She did not abuse drugs or alcohol, but did suffer from schizophrenia. Regarding his relationship with his father, he stated that they got along "relatively well." However, his father was absent a lot because he worked 2 jobs. He worked for the railroad and also at a furniture store. He did not abuse drugs or alcohol and did not have any mental or physical conditions.

This man reported having 2 brothers, an older brother who is 62 years old and a younger brother who is 50 years old. His 2 brothers have the same parents. He reported getting along "fine" with his siblings and they are still on speaking terms. This man reported having an "awful loss of memory as a child." He attributed this to the stress of having a mentally ill mother. His parents eventually divorced and his father remarried when Mr. Archer was in the military service.

When asked about childhood traits, this man acknowledged having had a problem with bed wetting up until the time he went into the military service. During his childhood he was never punished for this. He denied involvement in fire setting or torturing animals. He did not have extreme temper tantrums as a child and was not involved in more fights than most children. This man reported having been disciplined by both parents. When asked the means of discipline, he stated "Hit with a coat hanger. Not a lot of information, just bits and pieces. Scolded, spanked, nothing abusive." He denied being physically, sexually or verbally abused during his childhood or adolescence.

Mr. Archer graduated high school in 1964. He was an average student. He was never failed or held back in school and was able to get along with students and teachers. He denied having been a discipline problem in school. When asked about his involvement in school activities, he stated "Very few activities. I was in a class play. I was a class officer my Sophomore year. I was pretty shy." Ten years after high school, he received an Associates Degree in Business Administration from Tiffin University.

This man was in the United States Navy from 1964 to 1967. He was on a destroyer and was a "sonar man." No disciplinary action was taken against him while in the service. He received an honorable discharge at the rank of E-3. He denied receiving any special accommodations. Following the military, he started working at Whirlpool and was

Page 3
January 2, 2008

employed there for 38 years. He retired one year ago. He denied having any other significant employment. He denied ever having been fired from a job.

When questioned about his legal history, this man denied ever having been arrested as a juvenile. He denied ever having been arrested as an adult, other than the current situation. Regarding his traffic citations, he stated "Speeding and passing a school bus."

Mr. Archer has been married for 39 years. He denied that there is a threat of separation or a divorce. His wife worked in a factory for 10 years. She does not abuse drugs or alcohol. About her, he stated "She's standing by me. She's a dependent woman, not independent."

## REPORTED HEALTH HISTORY

On his health assessment form, this man described his general medical health as being "excellent." He is current taking the medications "Lipitor, Indural and Citalopram (Celexa)." His only operation was having his knee scoped and he reported having allergies in the form of "hay fever." He also indicated suffering from anxiety, starting in June 2007. In the current problem section of the form, he checked having "frequent headaches and ringing in ears." He drinks one cup of coffee per day and smokes one pack of cigarettes per day. He described his recent alcohol usage as being "light (less than daily)." He reported having a family history of "cancer."

During his interview, he described his appetite as being "pretty good," although his weight has gone down 17 or 18 pounds due to the recent stress he has experienced. He denied suffering from significant sleep disturbance and typically sleeps 6 to 8 hours. When questioned specifically about surgery, he reported "Knee scoped, tonsils out, a release on my wrist." He denied having had any serious illnesses or head injuries. He is currently taking the medications "Lipitor, Indural and 10 mg of Citalopram." He denied ever having been psychiatrically hospitalized. He is receiving "court-appointed counseling" with Maralyn Logsdon, LPCC. He has been seeing her approximately once a week for seven months at her private office.

## REPORTED DRUG AND ALCOHOL USAGE

During the interview, Mr. Archer described his use of alcohol as "seldom." He denied ever having had a problem with alcohol. When he does drink, he will have a beer. He did report smoking one pack of cigarettes a day. He denied using any street drugs. He did report "In the military, I tried one marijuana cigarette."

Page 4
January 2, 2008

## MENTAL STATUS EXAMINATION

What stood out about this man's appearance and behavior during my contacts with him was the fact that he remained serious and for the most part had flat affect. On a couple of occasions, however, he did become emotional and "choked up" while talking. He was able to express himself in a clear and effective manner. His speech did not show any significant atypical qualities. He maintained adequate eye contact. His affect and mood were appropriate and there was somewhat limited variability to his expression. When asked if he is an anxious or nervous individual, he reported "probably not." He denied being either a sad or depressed individual. He denied suffering from crying spells until this happened. He commented "I cry more now than my whole life." He denied ever having attempted suicide or having had serious thoughts of suicide. He does not feel he ever would commit suicide. He denied having thoughts of homicide. He was oriented to person, place and time and was able to name the President of the United States, the previous Governor of Ohio and his Mayor. He was able to perform simple numerical subtractions (serial 7's and 3's) accurately. He did report having some "long term memory problems." This man was questioned extensively about signs and symptoms of mental illness, all of which he denied. He denied have had any unusual experiences or symptoms of mental illness. He denied ever having felt mentally ill. He denied feeling the need for psychiatric hospitalization at the present time. There was nothing in this man's clinical presentation, including his thought content or stream of thought which would indicate he was suffering from a severe mental disease or defect.

## REPORTED SEXUAL HISTORY

Mr. Archer stated he learned about sex "Probably pre-10 years old. Dad gave us a book about it." He then stated "The neighbor girl, I messed around with a little bit. I was 12, she was maybe 14 or 15. I didn't have sex until I was in the service. I was 18 or 19. The first time I went to the Mediterranean with prostitutes." This man reported that he started masturbating "maybe preteen." He denied ever having been obsessed with masturbation. When I asked him about dating, he stated "Very shy in school. Didn't have a girlfriend in high school. I was pretty afraid of girls." When I asked him if he ever had sexual contact with another male, he stated "The neighbor boy and my brother. We slept together in the winter. There was no heat upstairs. Involved just masturbation." When I questioned him about oral sex or anal intercourse with his brother or the neighbor boy, he denied these. He denied ever having been involved in exposing himself. When I asked him about window peeping, he stated "I don't know. Probably. Early teens." He stated that he was never obsessed with this and stated "Never got in trouble." When asked if he did this alone or with friend, he stated "With a

Page 5
January 2, 2008

friend I think, or with the girl down the street, maybe by myself. Stopped in my preteen years." This man could remember any specific information. He denied ever having had any sexual contact with an animal. When I asked him about going to strip clubs, he stated "A few times to burlesque shows, not strip clubs." This man denied ever having gone to a prostitute after leaving the military service. He was never accused of inappropriate sexual behavior while in school and denied ever being accused of inappropriate sexual behavior after leaving school, other than the behavior involved in the instant offenses. He had never been involved in bondage or in inflicting pain on a sexual partner. When I asked him if he felt he had any unusual sexual interests, he stated "Pretty conventional. With my wife only. To the prostitute in the service overseas a half dozen times at most." He then denied ever having been obsessed with sex, but regarding the current situation, he stated "I felt it was getting a little habitual. That is what was scaring me. It was all new to me. That was what was scaring me." Mr. Archer denied ever having been sexually attracted to children. He then stated "My only conclusion what got me down this road was the pornography." Regarding his reaction to what he did, he stated "Why did I do that? What was my purpose? I didn't plan it out or think it out. I just did it. My reaction? Shame. It is a hard pill to swallow." When asked the number of sexual partners he's had, he paused and stated that besides the prostitutes while he was in the service, "Just my wife. We'll be married 40 years next month." When asked the age range of females he is attracted to, he stated "early 20's to 50's."

## DEFENDANT'S VERSION OF THE OFFENSES

This man stated that he is facing 2 counts. They do not involve an actual individual, other than the undercover police. He went on to state "Online for 7 years or better. This was at the end. I viewed a lot of adult pornography. That is where it should have stayed. Got it through trading. I didn't go into sites and stuff. I had a lot of shame and guilt. I had deleted all of this. At least I thought I did, before the agents ever came to my house. I had gotten canceled by the server, AOL, when I had gotten all of this. I asked them why. They wouldn't tell me. I was done with it. I went to AT&T high speed, maybe in late January, early February. I was off line a couple of weeks. Then was on it (AT&T) until March 21, 2007 when agents came. I was not into any pornography sites. I just did whatever else. Online banking, played games, communicated with relatives, did some research to help grandkids. Primarily on AOL, but also on AT&T."

This man then stated "I was viewing adult pornography pictures. All from trading. A lot of the sites were pay sites and I wasn't paying for anything like that. I was concerned about security. A lot of hackers on AOL. Had read Playboy's or Penthouse. Playboy subscription while I was in the Navy. Communicated in chat rooms. Adult ones. Logged on to some non-adult chat rooms. Curiosity killed the cat. That is where the 2

Page 6
January 2, 2008

counts came from. Email. Started chatting with one person, thought a juvenile." I then asked him if he actually thought he was communicating with a juvenile, to which he responded "Yes. I believe so. Didn't think an adult posing as a juvenile. I'm sure I knew that was going on. That is what puzzles me about this whole mess. Sent some pictures, talked. I just flat did it. Came out with it. But it didn't set well with me. I have grandkids of my own." He has 3 grandsons ranging in age from 16 down to 9 years old and 3 granddaughters ranging in age from 14 down to 9 years old.

When I asked him what specifically took place, he stated "Asked her if she ever touched herself. If she ever seen her father naked. I think I did ask her to masturbate. I don't want to remember. The pictures, I don't recall exactly. Officers showed me some. I was so upset. Underage girls, a boy and a girl. My wife wasn't there when they questioned me. Like 5 officers came to the house, 2 from Cleveland, Homeland Security. I had just gotten out of bed before that. The guilt was there while I was doing this. This is why I was happy that AOL canceled. I had gotten some warning about forwarding pictures (graphics)." I asked Mr. Archer if he ever planned to meet with a person, to which he responded "Absolutely not. No intention. Nor with adults. Was just entertainment. Poor choice of entertainment. I was pretty ignorant. No idea the possible consequences of doing this, but I felt it was wrong. Even the adult pornography, I felt it was wrong. A lot different than in Playboy magazines." When asked if he intentionally pursued underage individuals, he stated "Not really. A lot gotten in trading. I deleted it as soon as I got it."

## PSYCHOLOGICAL TEST RESULTS

Mr. Archer's MMPI-2 result appeared valid for interpretation. It appears he was able to understand and respond to the test items in a consistent manner. This man may have been somewhat defensive. All of the basic clinical scales on the MMPI-2 fall within normal limits. Two of these scales, however, are moderately elevated within the normal limits range. This configuration is similar to that found with individuals who may have some somatic complaints and may be somewhat self-centered, suggestible and affiliative. They may be unconventional, immature, tend to have superficial relationships and are energetic. It appears this man has a traditional, masculine interest pattern. These individuals tend to be dissatisfied and unhappy. All of the Restructured Clinical Scales fall within normal limits. The Content Scales were similar to those found with individuals who feel fearful and uneasy much of the time. They report multiple specific fears, such as animals, heights, lightening, etc. Elevations on Supplementary Scales are similar to those found with individuals who tend to internalize and are conventional and cautious. They have a slow personal tempo and tend to be introverted. All of the Personality Psychopathology Five (PSY-5) scales fall within normal limits. The subscales are similar to those found with individuals who described strong needs for

Page 7
January 2, 2008

attention and affection from others and fear that these needs will not be met. They describe others as honest, sensitive and reasonable. They deny having negative feelings about other people.

These test results certainly do not indicate significant psychopathology, although it should be kept in mind that Mr. Archer may have been somewhat defensive in approaching the test questions. Nonetheless, all of the basic clinical scales did fall within normal limits.

The Static 99 is a brief actuarial instrument designed to estimate the probability of sexual and violent recidivism. In the present case, Mr. Archer's score falls in the medium/low risk category. This was only due to the fact that the thought-to-be victim was unrelated to Mr. Archer and was a stranger to him. His score suggests a 16% likelihood of sexual recidivism within a 15 year period of time.

## CONCLUSIONS

Timothy Archer is a 61 year old, married (for 39 years) male who graduated high school and holds an Associates Degree in Business Administration. He worked for Whirlpool Corporation for 38 years before retiring one year ago. Mr. Archer has been involved in court-ordered counseling during the past 7 months and also is currently taking anti-depressant medication. Mr. Archer denied having receiving any prior mental health treatment. Mr. Archer was in the United States Navy from 1964 to 1967 and received an honorable discharge. This man has no prior arrests, either as a juvenile or adult. He denied ever having had a problem with drugs or alcohol. He claims that several years ago, he became involved in viewing and trading pornography over the internet. This continued and he eventually received some child pornographic materials. He participated in some chat rooms and eventually ended up communicating with an individual believed to be a juvenile. It appears this man is a victim of the "in the privacy of one's own home" phenomena in which the individual looses sight of the fact that while on the internet, they are no longer really within the privacy of their own home.

At the end of this evaluation, I asked this man if there is anything that he wanted to add about himself, to which he responded "When I got arrested, I further felt this deep shame and shock. Had to apologize to my wife the best I could. I don't feel it is enough. I am so ashamed of myself, as is she. (he began to cry). Before, if not on medication, I wouldn't be able to deal with this." He expressed concern about his wife, stating "My wife is a dependent person. She don't like to drive at all. I am the provider for our family. I asked her for suggestions, but make the decisions. Not a whole lot of close friends." This man had expressed feeling that he destroyed many lives, not just his own.

Page 8
January 2, 2008

DSM IV TR Diagnosis:

Axis I - 309.28 Adjustment Disorder with Mixed Anxiety and Depressed Mood; 311 Depressive Disorder NOS

Axis II - Inadequate personality traits (provisional, rule out Personality Disorder NOS)

Axis III — Frequent headaches, hay fever, ringing in ears, high cholesterol

Axis IV — Psychosocial and environmental problems; current legal situation

Axis V — Global assessment of functioning = 50 (current)

In order to assess sex offense recidivism, I considered both Static (unchanging) and Dynamic (changing) risk factors, which have been shown to be correlated with sex offense recidivism. Four major Static factors include: 1) the offender's age upon release, where younger is more predictive of recidivism; 2) the victim gender, where male is more highly correlated with recidivism; 3) the number of prior sex offenses; and 4) the offender's relationship to the victim, where unrelated or stranger victims are more highly correlated with recidivism. In the present case, only the fourth factor is significant since the thought-to-be victim was a stranger and was not related to him. Dynamic factors include consideration of sexual deviance and criminal lifestyle as most highly correlated with recidivism. I have no documentation of either in this man's history, admitted by self-report or collateral information. This man does not have a prior criminal record. While the instant offenses certainly suggest sexual deviance, Mr. Archer denies any attraction or inappropriate behavior towards children. It does not appear there is any information to suggest a pattern of sexual deviance preceding the offenses. The absence of these significant risk factors seem to place Mr. Archer at low risk for sex offense recidivism.

Regarding the factors the court considers for sexual predator designation, the following would be significant.: The relatively young age of the victim. However, the other factors appear inapplicable. There is only one victim, not multiple victims. Neither drugs nor alcohol were used to impair the victim or prevent resistance. There were no prior sex offense allegations or convictions. Mr. Archer was not being monitored by the legal system or supervised at the time of the offense. There was no mental illness or disability noted and there were no life threatening behaviors or behaviors involving torture or ritualistic acts with the victim.

Taking all of the information which was available to me into consideration regarding Timothy J. Archer, it is my opinion that there is a low risk of sex offense recidivism.

Page 9
January 2, 2008


Whether or not the court decides upon a period of incarceration for Mr. Archer, he will definitely need to continue with his mental health treatment and sex offender treatment. As a further safeguard, if released into the community, there should be no contact between Mr. Archer and children, unless supervised by a responsible adult. A restriction of not being able to use the internet, along with ongoing monitoring and supervision, should adequately manage any risk associated with Mr. Archer.

If there are any questions about this report, I can be reached at 419-474-4471.


Gregory E. Forgac, Ph.D.
Clinical Psychologist

12/12/07

To Whom it May Concern:

I have known Timothy J Archer & his family for over 50 years. Trying to recall my first memory of Tim was when we played little league baseball together, on the same team with his brother Greg being on the team also. We never ran around much together as kids but would occasinally play baseball or basketball with other Guys. I always remember Tim as being a good kids not one to get in trouble.

I graduated 2 years before him & got married that august, but after work we would play basketball at his house across the street from us. I remember his mom calling him & Greg in for supper & the game was over.

After he graduated from high school, he joined the navy. I saw him a a couple of times when he would come home on leave, but lost most contact with him until he was discharged from the Navy. While he was stationed in Rhode Island he met & & married his wife Thora. After he was discharged him & Thora moved back to North Baltimore to live. He brought Thora to our house one night shortly after he came back in late 1967 early 1968. My wife Mary & I & Thora & Tim became close friends & would go back & forth to one another

RENDERED JAN 0 7 2008

homes, playing uno or different card games.

Other than the navy the only job I recall Tim having was at Whirlpool where he worked for over 35 years.

He was always a honest man trying to raise his family, he had 3 children, the best he could. Thora & Tim raised the children, Tim, Matt, & Missy in church & they all grew up to be really great kids.

We moved away for several years but kept in touch by mail & telephone & they came to visit us once for a weekend when we lived in Indiana. We moved back in 1986 & once again renewed our friendship.

I have always felt that Tim was a good man, a good husband, father, grandfather, & friend. I never recall him ever being anything but a good person. We would take our boys fishing at times & he & I would go golfing about once a week. We have always been close friend with Tim & Thora although at times we would not see other for a few years.

I hadn't seen Tim & Thora when my oldest daughter got cancer in Feb 2005 & she died in Nov 2007. She lived in Oxford Mich but we brought her body back

for burial in our family plot. I had her
her committal service & looked up & there was Jim
I was so glad he had came.

Over the 50 years I have known him
not once did I see him break the law.

I know in my heart of hearts he is so
sorry for what he did.

Sincerely, William P. Harmon
1312 Bernard ave.
Findlay, Ohio

MH/WPH.

Dear Sir:

As God as my witness, I would like to share with you the man I know. We were raised in the time man takes care of his wife and in the forty years of marriage he has been a loving care takers and soul mate! We raised three childrens in church giving to them the value of God and family in their lives. They now are raiseing their childrens with the same values which makes us so proud! We have such a close and loving family that if one is in need we are all there to support them in love and prayers. We raised our children in North Baltimore

(2)

and had no trouble with
anyone. We've lived almost
fifteen years at a trailer
court in Findlay without
any problems.

We have started our
retirement years and our
love has grown deeper than
ever. We do everything
together and enjoying it
so much! I have a fear
of driving so he does all
the driving and he said
I'm his eyes. We enjoy
following the grandchildren
in their school sports and
concerts. They touch our
hearts with a smile or
wave when they see us
there in the crowd. Once
a month, we would pick

(3)

up Mom and Dad and
take them out to lunch.
We were taking his nephew's
wife to Toledo for doctor
appointments for cancer.
We were cooking extra
food so our neighbor
lady would have meals
because she was dealing
with cancer and couldn't
get around. It blessed
us so to reach out be-
cause she has past away.
We feel so good to be
available for anyone in
need including family!
     We are not rich money
wise but are very rich with
God's Blessings that you
can't put a price on.
nothing touches our hearts

(4)

more than, three loving children and six Grand-Children who always has hugs, kisses, and tells us they love us! My man is a loving and caring husband, father and Grandfather who is loved by all of us.

For forty years, he has done no wrong or hurt anyone! Our marriage is so strong. I have forgiven him and want to move on with the man I know, love and need so much!

Sincerely,
Thora G. Archer

To Whom it may Concern,

I am Melissa Ann Cross, Timothey James Archers daughter. My parents are excellant people couldn't ask for better parents. We grew up in a christian home went to Church every sunday and my parents involved in Bible Study. My mom played the piano at church. They installed good values as we grew up And now that I'm a parent I have have taught them to my daughter. My dad is a very loving and caring person and a good provider for the family he was always there for us like a father should be. This is my second marriage and my last. Ted is a wonderful man in so many ways he reminds me of my father. My first marriage was horrible the only good thing that came

from it was my daughter Ashley Marie Wagner. My Dad & Mom where there for me and my daughter they helped me emotionaly. My daughter was only 2 years old. So my daughter and I have a special closeness to my parents its not just the things my parents bought for us its the love they gave us and the time they spent with us. I thank God for my parents that they where there for my daughter and I, they helped us more than they know. My daughter loves her Grandpa and Grandma so much they where there for her more than her father was. My husband know is a great man he gets along with my parents we get together alot we go out to eat take day trips, go shopping we have so much fun just enjoying each others

Company and laugh so hard. It's just been so hard since my dad is under house arrest, its not the same without him. I know my father did wrong and has hurt the family but I strongly believe my father would never hurt anyone. I think my dad has learned his lesson he has paid sorry for hurting his family. I love my dad and forgive him I will not turn my back on him you are suppose to be there for your family in good times and bad. So please don't send my Dad away I think he has been punished enough being on house arrest so long and missing out on a lot of family outings. Thanks for your time.

Sincerely,
Melissa Ann Cross
12-13-07

I remember growing up, every sunday we would go to church. My mom and dad would also have bible study at our house sometimes. Every body at the church would take turns. My mom & Dad also ran the house hold very church oriented. My Dad & Mom would always tell us if things weren't going good, just pray, and god would help you through your problems. I can also remember growing up my Brother, sister, and I, were never allowed to cuss. Also I never heard my dad or mom cuss either. I can remember growing up, my dad would always make us kids think about the consequences of our actions. Thats why I think I stayed out of trouble, for the most part. I thank my dad for that. My dad is very family oriented, he was always there for me. He always went to my games when I was in school. Never missed any school functions.

When my wife and I first got engaged we got an apartment together. We soon found out that we couldn't afford it. So I asked my dad & mom if we could live with them while we saved some money up. They were always there for us. Also when my wife and I built our first home, my dad was out there every weekend helping me build it.

My Dad is a great grandpa too. He always gives the grandkids money when they loose their teeth, and when they get on the honor roll. Plus my Dad & Mom would always go to the grandkids sports events, and school function. He loves his grandkids so much, he would do anything for them too. I could go on, and on about my dad. But to some it up. My Dad is Loving, caring, giving, and has the heart of gold.

Thanks,
Matt Archer

Growing up as a child our
family and life styles were the
average middle class family. Dad
worked at Whirlpool and Mom baby sat
and later ondid part-time jobs to
make ends meet. We never had alot
of money, but we never went without.
The biggest thing that Dad and Mom
instilled in me was going to church.
As kids we went to church on
wednesdays and sundays. As we
grew and had more activities going
on we went to church on sundays.
Without Jesus as my Lord and
Savior I would be lost. He has
done so much for me and helped
me so much.

My dad and mom have been
involved in everything I did as a
child. Dad coached my little league
baseball team. In high school Dad
and Mom were at all my school events
and sporting events.

In 1992 I got married. Dad and
Mom let me and my wife at the

time move in with them so we
could save up to buy a house. In
1994 my daughter was born and in
1998 my son was born. Dad and Mom
were there for us at the hospital
and when needed at home. I got
divorced in 2000. Dad and Mom helped
with grocerys and the tough times.
In 2004 I bought a house that
needed a lot of work. My Dad,
brother, unkle, and friends helped
me work on the house. Usually
we worked on the house a few
days in the week and every
weekend for about a year. Any
time I have asked my dad for
help he was there.

Tim J. Archer Jr.

To whom it MAY coNceRN

These pAST almost ten months have been the most traumatic and devasting in my entire life. The FiRst two months I suffered deep anxiety and feAR, I couldn't eat and quickly lost 17lbs. that led me to go to my doctoR FoR anxiety medicine. The medicine finally helped me to be Able to eat and help with the deep anxiety, but it doesn't take it all Away.

Losing most of my freedom is very difficult as I am the sole pROvideR FoR my wife and I, making our finANciAl decisions and taking caRe of our home, etc, and doing All the driving As my wife feArs driving. My wife is veRy dependent on me FoR every thing, and we ARe pretty much inseperAble, even moRe Now as we ARe both RetiRed. We live A simple life oN Retirement income, living life As best we caN and foR not only our love foR each other, but for our three chidRen + six grandchildRen.

-2-

In my entire life, I have never made such a terrible mistake, and caused so much hurt and pain to my family; which has caused me to feel and suffer deep shame and humiliation. I am a Christian and have ask my Lord and Savior Jesus Christ to forgive my sin and I've shed more tears over my improper behavior than all the rest of my life put together. I have never in my life failed so miserably and it cuts deep into my soul, and I've suffered in every way possible over this.

This has been nothing short of a horrific nightmare to me. I deeply apologize for my improper behavior, and so sorry, so very sorry. Please, Please I'm begging for mercy and need so much to put this behind me, so I can move forward in my simple life with my wife, and to begin the healing process

-3-

By making such a terrible mistake I have jepordized my character and integrity, but does not define who I've been the rest of my 61 years of life. With God's love & help, and the love of my family, we will get through this horrible time and move on in our lives.

Sincerely, Timothy J. Archer Sr.