1

81gQarcC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              07 CR 757 (RJS)

5  TIMOTHY ARCHER, also known as
   MatoorM,
6
            Defendant.
7
   ------------------------------x

8
                                     New York, N.Y.
9                                    January 16, 2008
                                     11:15 a.m.
10

11 Before:

12              HON. RICHARD J. SULLIVAN,

13                                   District Judge

14
                         APPEARANCES
15
   MICHAEL J. GARCIA
16      United States Attorney for the
        Southern District of New York
17 MICHAEL MAX ROSENSAFT
        Assistant United States Attorney
18
   THOMAS PATRICK KURT
19      610 Adams Street
        Toledo, OH 43604
20      Attorney for Defendant Archer

21

22

23

24

25

81gQarcC

1                    (In open court; case called)

2          THE DEPUTY CLERK:   Counsel, state appearances for the

3     record, please.

4          MR. ROSENSAFT:   Good morning, your Honor.   Michael

5     rose even saft for the government.

6          THE COURT:   Mr. Rosensaft, good morning.

7          MR. KURT:   Your Honor, Thomas Kurt, 610 Adams Street,

8     Toledo, Ohio, representing Mr. Archer.   I'm admitted to the

9     court pro hac vice on this case, also, with the appearance of

10    Mr. Donald Yannella.

11         THE COURT:   All right.   Mr. Kurt, good morning.

12    Mr. Archer, good morning to you.

13         THE DEFENDANT:   Good morning, your Honor.

14         THE COURT:   Please have a seat.   I am fighting

15    laryngitis or something, so I don't normally sound this way,

16    and I apologize.

17         We're here for sentence.   I should note for the record

18    this is the first time Mr. Archer is appearing in front of me.

19    This matter was previously assigned to Judge Karas.   On

20    August 14 of 2007 Mr. Archer entered a plea of guilty before

21    Magistrate Judge Peck, I believe, to Counts One and Two of the

22    indictment.   Sometime after that in September or October, this

23    matter was reassigned to me.

24         I will say under normal circumstances I do not like to

25    be meeting a defendant for the first time the day of

81gQarcC

1    sentencing, which is why I don't refer guilty pleas to

2    magistrate judges.  If that's true under normal circumstances,

3    I think it's even more true in this case, which I think is

4    atypical in many ways.

5          So I am prepared to go forward with sentencing, and

6    I'll tell you candidly, I've spent a great deal of time

7    reviewing everything that's been submitted, reviewing the case

8    materials and thinking long and hard about this case, but I

9    want to let the parties know that I certainly reserve the

10    right, in light of what transpires here today, what arguments I

11    hear and what information I'm given, to put off this sentencing

12    so I can further consider the issues here because I view this,

13    frankly, as an atypical sentencing, and there's a lot of things

14    I want to hear from counsel and from Mr. Archer as well.

15          I know Mr. Archer has traveled a great distance.  I

16    know he's waited a long time.  He probably is looking for some

17    closure in this matter, but I assume all the parties would

18    agree it's in everyone's interest that I have the time I need

19    to really consider all the issues and all the arguments.  So I

20    may do that depending on how things go.  Anyone who objects to

21    that?

22          MR. ROSENSAFT:  None from the government, your Honor.

23          MR. KURT:  Your Honor, no objection for Mr. Archer.

24    Thank you.

25          THE COURT:  In the first instance I should accept the

81gQarcC

1    guilty plea, which has not yet happened.  I have reviewed the

2    transcript.  I've reviewed the plea agreement of the plea that

3    was taken Magistrate Judge Peck.  Magistrate Judge Peck in the

4    transcript recommends that the plea be accepted.  Do counsel

5    agree with the recommendation of Magistrate Judge Peck that

6    this plea should be accepted?

7              MR. ROSENSAFT:  The government does, your Honor.

8              THE COURT:  Mr. Kurt?

9              MR. KURT:  Likewise for Mr. Archer, your Honor.  Thank

10   you.

11             THE COURT:  Having reviewed the transcript, having

12   reviewed the plea agreement and minutes, I find that

13   Mr. Archer's plea was entered knowingly and voluntarily; that

14   he understood and waived his rights before entering his plea;

15   and there was an independent basis in fact for each of the

16   elements of the offenses to which he pleaded guilty.  I,

17   therefore, accept his guilty plea and find him guilty on Counts

18   One and Two of the indictment.  Now we have that.

19             With respect to sentencing, let me tell you what I

20   have and what I have reviewed.  I have received and reviewed

21   the PSR and the recommendation which is dated January 4 of

22   2008.  I have received and reviewed the January 8, 2008 letter

23   of Mr. Kurt, which included the May 9, 2007 mental health

24   evaluation of Mr. Archer prepared by Marilyn Logsdon.  It also

25   included the January 2 psychiatric summary prepared by

81gQarcC

1   Dr. Gregory Forgac.  Mr. Kurt, do you know?

2           MR. KURT:  That is right, your Honor.

3           THE COURT:  I have reviewed letters to the court from

4   family members and friends of Mr. Archer, including William P.

5   Harmon.  It's handwritten, so I'm not sure if I read it

6   correctly.  It looked like Mr. William P. Harmon, who is a

7   family friend of Mr. Archer and his family.  Mr. Archer's wife,

8   Thora Archer; Mr. Archer's daughter, Melissa Ann Cross;

9   Mr. Archer's son, Matt Archer; Mr. Archer's other son, Timothy

10  Archer, Jr. and Mr. Archer himself.  I've also reviewed the

11  defendant's January 8, 2008 sentencing memorandum.  Reviewed

12  the government's January 10, 2008 response to Mr. Kurt's

13  submission.  And Mr. Kurt's January 11, 2008 reply to the

14  government's submission.  Let me take two minutes.

15          (Recess)

16          THE COURT:  Sorry about that.  In any event, those are

17  the things I have.  The last thing I mentioned was reply to the

18  government's submission that was dated January 11 from

19  Mr. Kurt.  Is there anything else any party believes I should

20  have in connection with sentencing?  Mr. Rosensaft?

21          MR. ROSENSAFT:  No, your Honor.

22          THE COURT:  Mr. Kurt?

23          MR. KURT:  No, your Honor.

24          THE COURT:  Mr. Kurt, have you received a copy of the

25  presentence report?

81gQarcC

1          MR. KURT:  Yes, I have.

2          THE COURT:  Read it and discussed it with Mr. Archer?

3          MR. KURT:  Yes.

4          THE COURT:  Mr. Archer, have you had sufficient time

5    to read the presentence report and discuss it with your

6    attorney, Mr. Kurt?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Mr. Kurt, does your client have any

9    objections to the report?

10          MR. KURT:  Not formal objections, your Honor, other

11    than the comments that we've made in our sentencing papers, but

12    no objection.

13          THE COURT:  Right, and those we'll talk about, but no

14    objections.

15          MR. KURT:  Yes.

16          THE COURT:  Mr. Rosensaft, have you on behalf of the

17    government had a chance to review the PSR?

18          MR. ROSENSAFT:  Yes, your Honor, and the government

19    has no objections.

20          THE COURT:  As you all know, pursuant to *United States*

21    *v. Booker*, the Sentencing Guidelines are advisory.

22    Nevertheless, it's necessary to go through the guidelines

23    calculation as probation has calculated it.  The advisory

24    guideline range for each count is level 30 with a Criminal

25    History Category of I, which results in a Sentencing Guideline

81gQarcC

1    range of 97 to 121 months, which is Zone D.  That's a little

2    different than what was in the plea agreement, as I understand

3    it.  The plea agreement seemed to have a different calculation

4    for Count Two, and the PSR has concluded that actually by

5    virtue of Section 2G2.2, that that section applies to both of

6    the counts, and, therefore, the same guidelines application

7    applies to each.  Do I have that right?

8        MR. ROSENSAFT:  Your Honor, I believe the only

9    difference between the presentence report and the plea

10   agreement was the high end of the guidelines range, whether

11   it's 121 or 120 months.

12       THE COURT:  Well, I'm looking at the guidelines range,

13   and on page 4 of the PSR, footnote one, says:  The offense

14   level for Count Two would actually also be determined by 2G2.2

15   as the offense level involved the distribution, possession of

16   material involving the sexual exploitation of a minor.

17       MR. ROSENSAFT:  That's correct, your Honor.  I just

18   meant to say that the actual guidelines range wasn't different

19   between the plea agreement and the PSR.

20       THE COURT:  Well, right, the cumulative one, but

21   there's a difference with respect to the guideline calculation

22   for Count Two.

23       MR. ROSENSAFT:  That's right, your Honor.

24       THE COURT:  So everybody agrees that actually

25   probation got it right and the plea agreement got it wrong?

81gQarcC

1          MR. ROSENSAFT:  Yes, your Honor.

2          THE COURT:  As you pointed out, Mr. Rosensaft, there's

3    a ten year statutory maximum here.  The range is 97 to 121 and

4    so on any one count, it would be topped at 120.  However, by

5    virtue of the Sentencing Guidelines, I can structure the

6    sentences consecutively so that the additional time could be

7    served, if I were inclined to impose a sentence of 121 months

8    or greater, I could do so by virtue of a consecutive sentence.

9          MR. ROSENSAFT:  That's correct, your Honor.

10          THE COURT:  No objection to that, Mr. Kurt?

11          MR. KURT:  No, your Honor, I think that's a correct

12    statement of law.

13          THE COURT:  In terms of the actual advisory

14    calculation, I agree with the probation department, and I adopt

15    its finding, which is set forth in paragraphs 19 through 33.

16    Those paragraphs provide that Counts One and Two are grouped

17    together pursuant to Section 3D1.2(d); that the base offense

18    level is 18 for the offenses involved; that two levels would be

19    added pursuant to 2G2.2(b)(2) as the offense involved a

20    prepubescent minor or a minor who had not attained the age of

21    12, two levels; a five-level enhancement because the offense

22    involved distribution of materials to a minor pursuant to

23    2G2.2(b)(3)(C); four-level enhancement because the offense

24    involved material that portrays sadistic or masochistic conduct

25    or other depictions of violence; another two-level enhancement

81gQarcC

1    pursuant to 2G2.2(b)(6) as the offense involved the use of a

2    computer; another two-level enhancement pursuant to

3    2G2.2(b)(7)(A) as the defendant possessed at least 10, but

4    fewer than 150 images of child pornography.  I find there's no

5    victim related adjustments, no adjustment role in the offense;

6    no adjustment for obstruction of justice, for an adjusted

7    offense level of 33.  In addition, I find that the defendant

8    has accepted responsibility meriting a three level departure

9    pursuant to 3E1.1(a) and (b).  That leaves an adjusted offense

10   level of 30.  And a total offense level of 30.  With respect to

11   the criminal history, I find the defendant has no criminal

12   history points and is therefore in Criminal History Category I.

13        So, those are my findings.  That guideline analysis

14   would yield a range, as probation department has indicated, of

15   97 to 121 months.

16        I have a question here with respect to supervised

17   release.  The plea agreement indicates, and I think that

18   probation report also indicates, that there's a maximum of

19   three years of supervised release.  Is that correct.  I'm

20   asking both parties on this.  That's what the plea agreement

21   says.

22        MR. ROSENSAFT:  I believe that is correct, your Honor.

23        THE COURT:  The guidelines would call for, for certain

24   types of offenses, a lifetime of supervised release.  So my

25   question is:  Where the sentencing maximum for supervised

81gQarcC

1    release is three years, is it appropriate to then stack the

2    three-year terms so that a six-year term of supervised release

3    could be imposed?  Do you know the answer to that,

4    Mr. Rosensaft?

5              MR. ROSENSAFT:  I don't off the top of my head, your

6    Honor.  I'm happy to try to find out quickly.

7              THE COURT:  Mr. Kurt, do you?

8              MR. KURT:  Your Honor, I think I'll just kind of jump

9    ahead and tell you that Mr. Archer would welcome any amount of

10   supervised release.  I understand there may or may not be some

11   prison evolved, but he would welcome any amount of supervised

12   release that would possibly allow the Court to go lower on the

13   prison end, if not strictly to impose supervised release, so we

14   would certainly stipulate today that the Court could stack

15   those three year terms of supervised release.

16             THE COURT:  I appreciate that.  I understand the

17   point.

18             MR. KURT:  I understand the distinction the Court is

19   seeking.  I honestly don't have an answer to the legal question

20   that I can offer.

21             THE COURT:  All right.  Well, with respect to the

22   sentencing range 97 to 121, obviously, that is advisory.  So I

23   have to consider that in light of the factors set forth in

24   Title 18 Section 3553(a) as to whether I should impose a

25   nonguideline sentence in light of those considerations.

81gQarcC

1    Mr. Kurt has submitted -- and I want to commend you, Mr. Kurt,

2    I thought what you submitted was very helpful, very thorough,

3    very well-written, frankly.

4         MR. KURT:  Thank you, your Honor.

5         THE COURT:  The use of an any sentencing memorandum

6    and letters arguing for a sentence below the guidelines range

7    based upon the history and characteristics of your client and

8    the offense, the nature and circumstances of the offense.

9    You've also identified the other factors that are set forth in

10   3553(a).  And I want to hear you with respect to that.  You

11   have recommended or asked for a sentence of one year

12   incarceration followed by a term of one year home confinement

13   and then supervised release of an unspecified term with various

14   mental health monitoring, etc.

15        So, I want to hear you with respect to the factors

16   that are identified for consideration under 3553(a), how are

17   those cut with respect to the guideline sentence which is

18   obviously very high and much higher than what you recommended.

19   So let me hear you on that

20        MR. KURT:  Yes, your Honor.  Your Honor, I will tie

21   this into the Section 3553, but I guess I would just like to

22   speak generally for the moment if that's OK.

23        THE COURT:  Take as much time as you need.  I'm not

24   going to rush you.  I may jump in and ask you some questions.

25        MR. KURT:  That will be fine.  I'd like to preface any

81gQarcC

1    mitigation comments to the Court that we are speaking in

2    mitigation.  That doesn't mean that we're minimizing what

3    happened.  We're not minimizing the very serious nature of this

4    offense, but I am speaking in mitigation for Mr. Archer, but I

5    can tell you without hesitation that he fully accepts that this

6    is a very serious offense.  Quite frankly, at the end of the

7    day, for him when he analyzes what he has done off and on and

8    what he did, he finds his own behavior quite repugnant, and

9    he's made that very clear to me in the meetings at my office,

10   and I can't make that clear enough to the Court.

11          Judge, you have before you a 61-year-old man who is

12   retired, who's had absolutely no criminal history whatsoever.

13   I'm sure the Court is familiar with the case of Gall v. United

14   States, which in many respects gives this Court a great deal of

15   discretion in fashioning the sentence.  I bring that case up

16   particularly because Gall actually involved a defendant kind of

17   at the opposite end of where Mr. Archer stands.  Gall involved

18   a very young man who made also a very serious mistake in his

19   life, and he had the opportunity in a pretty short period of

20   time to demonstrate to the sentencing court, the district

21   court, that he was somebody who not only who could be

22   rehabilitated but was well on his way to being rehabilitated.

23          Here we kind of have the opposite.  We have a

24   gentleman who's 61-years-old.  He's toward the end of his life,

25   but what the Court has and what the Court can go on is

81gQarcC

1   Mr. Archer's lifetime and what he's done in his lifetime as

2   evidenced by his lack of criminal record, as evidenced by his

3   work history, which was one job 30 years straight at the

4   Whirlpool Factory.

5           THE DEFENDANT:  Over 38 years excuse me.

6           MR. KURT:  Yes, 38 years, excuse me, in Findlay, Ohio.

7   Of course, the Court has the letters before it from his wife,

8   from his children, who also obviously find his behavior

9   repugnant.  They do.  I can't sugar-coat that.  And it would be

10  easy enough for anybody to look at what happened here and just

11  want to turn their back on Mr. Archer.  That has not occurred

12  in this case.  His wife, his children, his friend, they have

13  all forgiven him, much more so than he's forgiven himself,

14  quite frankly.  It's going to take a long time for him to do

15  that.

16          So, you have before you a man who has a record in the

17  sense that his life is complete in many respects, and the Court

18  can see what kind of a life he has made other than this

19  terrible mistake that he recently made.

20          Your Honor, in sentencing him, I guess I would ask the

21  Court to seek some balance.  I know -- obviously, we just

22  discussed what the guideline range is here.  It's a very high

23  sentence that is suggested by the guidelines.  And the Court is

24  going to have to somehow balance that against -- and this is

25  what is called for, quite frankly, in Section 3553 is to

81gQarcC

1    balance that against the actual characteristics of Mr. Archer

2    and what he actually did and what his attitude right now is

3    with respect to what he did.

4         What he did, I don't want to go into all the details,

5    but obviously there was possession of child pornography, and

6    I'll be very frank with the Court.  Mr. Archer's view of all of

7    this gets somewhat muddled up just by the fact that he feels

8    very guilty that he looked at any pornography at all.  And he

9    did this off and on using the computer and the internet, I

10   guess, really for a relatively short time after he retired and

11   he had, I guess, too much time on his hands, one could say.

12   And so he would go through these periods where he would view

13   pornography and then feel guilty about it, then delete the

14   pornography from his computer.  More than once he went through

15   that process.  What happened here, of course, is that he seems

16   to have crossed -- he did, he crossed the line when he made

17   some communications with somebody who he thought was a

18   teenager, who was not a child, and I don't want to get -- I

19   don't want to split too many hairs here, but he thought he was

20   dealing with a teenager, and he made some very inappropriate

21   sexual comments to what he believed was a teenager.

22            THE COURT:  Well, a 14 year old.  So a very --

23            MR. KURT:  Very young, yeah.

24            THE COURT:  Very young.

25            MR. KURT:  And, again, I'm not going to -- I

81gQarcC

1    understand what the Court is saying, and I agree.  What the

2    Court needs to know, and I think is very important, and much of

3    my effort here would be to let you know that he had absolutely

4    no intention of meeting up with a 14-year-old girl, of doing

5    anything to a 14-year-old, of acting out on any of this.  I'm

6    not sure that I can characterize it as simply nothing about

7    fantasy, and I am confident, your Honor, and I hope that you'll

8    be able to sense from Mr. Archer that there was absolutely no

9    intent to go any further than what did, wrong as it was.

10           THE COURT:  Let me ask you this:  It's not clear to me

11   from the record as to when this conduct began, i.e. sort of

12   collecting or downloading images, pornographic images, on his

13   computer, when that began, when the child pornography became a

14   part of that and to what extent it stopped and started on

15   multiple occasions.

16           MR. KURT:  Your Honor, I think maybe you could ask

17   Mr. Archer that, but my impression is that this began after he

18   retired and when he had time for these things, when he had time

19   at home.  More or less his wife was there, but in some other

20   part of the home.  That's my impression.  You may want to

21   address Mr. Archer directly about that.

22           THE COURT:  The other question I have then is sort of

23   collecting certain images is obviously a crime when it involves

24   minors --

25           MR. KURT:  That's right.

81gQarcC

1          THE COURT:  -- but the conduct then sort of morphed

2     into being in chat rooms and then talking to a person he

3     believed to be a minor.

4          MR. KURT:  Right.

5          THE COURT:  And I'm not sure whether there is evidence

6     forensically whether this was an isolated incident or whether

7     this was something that was common, and we don't know how many

8     other 14-year-olds he may have talked to.

9          MR. KURT:  OK.  I cannot answer that.  Again, I would

10    suggest maybe Mr. Archer could answer that directly.

11         THE COURT:  Let me interrupt you for a second and see

12    if the government can enlighten me at all.

13         Mr. Rosensaft, the computer was seized, the hard drive

14    was examined, images were lifted off the hard drive that had

15    been deleted from the computer, and I understand how that

16    works.  I don't know, frankly, forensically whether one can

17    determine from a computer whether there had been sessions,

18    communication sessions in a chat room on multiple occasions.

19    Do you know the answer to that?

20         MR. ROSENSAFT:  Your Honor, when the agents examined

21    the computer, they didn't discover any other such sessions.  My

22    understanding is it would only be on the computer if he had

23    recorded them or he had saved them somehow, and Mr. Archer

24    deleted or tried to delete all of these pictures.

25         THE COURT:  Well, the pictures I get.  But he sent an

81gQarcC

1   e-mail or e-mails to the undercover whom he believed to be a

2   14-year-old, and he used e-mail for that, correct?

3           MR. ROSENSAFT:  That's correct.  It started off, I

4   believe, as an instant messaging.  Then they connected into a

5   chat room.

6           THE COURT:  Is there other indicia of instant

7   messaging or communications in a chat room with persons other

8   than the undercover?

9           MR. ROSENSAFT:  We have no evidence of that.

10          THE COURT:  Would you by examining the computer or is

11  that something that is beyond the ability of forensics to

12  assess?

13          MR. ROSENSAFT:  It would if it existed still in the

14  temporary internet files or other such files of the computer.

15  I don't know -- I never received from the agent the time

16  period, for instance, of how long the temporary internet files

17  went back to, so I don't know how far they were able to look

18  back to see if any of those existed.  I could certainly find

19  out for your Honor.

20          THE COURT:  Well, I may ask you to do that.  With

21  respect to the January correspondence with the individual who

22  was the undercover, was that then recovered from the hard drive

23  of the computer?

24          MR. ROSENSAFT:  No, it was not.

25          THE COURT:  That was not.

81gQarcC

1      MR. ROSENSAFT:  It was not.  It was on the computer of

2  the undercover officer, obviously.

3      THE COURT:  That's what I understand.  So the

4  examination of the computer doesn't provide support one way or

5  the other whether this was one instance or a pattern of

6  instances stemming -- going back over a period of years?

7      MR. ROSENSAFT:  That's correct, your Honor.

8      THE COURT:  Mr. Kurt, I'm sorry to interrupt you.

9      MR. KURT:  That's fine, your Honor.  In that regard, I

10  think if there had been a lot more, I would assume the

11  forensics would have found something; and I'm sure they did

12  their job, did it well, and looked through whatever they found.

13  I would have to agree that in the end there's no technical

14  answer to your question, unfortunately, and I would welcome you

15  to ask Mr. Archer about that.

16      THE COURT:  All right, and I may well do that.

17      MR. KURT:  So I've talked to you, your Honor, about

18  Mr. Archer's character and the good things about him and he has

19  said to me over and over on most occasions in a very emotional

20  state; that this was a terrible, terrible mistake that he made;

21  that he so much wishes that he could undo this mistake.  He

22  regrets it.  I have to tell you, your Honor, that I've never

23  seen a defendant as adamant with those kinds of feelings and

24  statements about their behavior.  I can tell you that the

25  emotions that have surrounded those statements and those

81gQarcC

1  expressions certainly would indicate that this is a sincere

2  statement on Mr. Archer's behalf.  This is just not something

3  that he's ginning up for sentencing and he's asked me to say to

4  the court that it's the real thing.

5       THE COURT:  I will credit that.  I think that's

6  relevant to 3553(a) with respect to characteristics of the

7  defendant.  His sincere remorse is something that I think I

8  take into account, and it may be different from the remorse of

9  others in similar circumstances.  Certainly, I have no reason

10  to doubt the sincerity of the remorse here.  Certainly, it's

11  reflected in his letter to me.  It's reflected in statements he

12  made to the social worker and to the psychiatrist and to you.

13       So, I'll hear from the government on this, but I think

14  I'll credit that, but there are other issues that are going to

15  the characteristics of the defendant that I want you to talk

16  about, including you may a point in your submissions that he

17  had deleted these things before he was arrested.  So that

18  perhaps this differentiates him from other defendants.  But at

19  the same time you told me that he would do this periodically,

20  so it doesn't necessarily give me confidence that he had put it

21  behind him.  Rather, perhaps, he was just in sort of a dormant

22  phase.

23       MR. KURT:  In all honesty, your Honor, and Mr. Archer

24  did tell me that this sort of cycle went on more than once, and

25  you're correct, your Honor, it's not as though we can stand

81gQarcC

1    here and tell you that this only happened one time and that he

2    deleted it.   That's not exactly the case.   I can tell you, and

3    I don't know how much the Court will be able to sense from

4    Mr. Archer, but I can tell you that I am utterly convinced that

5    Mr. Archer would never again view any pornography of any kind.

6         This criminal case, this situation, what he's put his

7    family through, has, to use an analogy, has been a two-by-four

8    smack across the head for him.   It has really shot right to the

9    core of him in a lot of ways.   Frankly, I don't think he even

10   wants to use a computer again in his life.   We would welcome

11   that the Court would set that as any term of any kind of

12   supervised release.

13        THE COURT:   Well, I would consider it.   It seems to me

14   it's somewhat akin to sort of a gambler walking into a casino.

15        MR. KURT:   I would agree.   The thing sits there, and

16   it sits there as a temptation, I'm sure, and I think that would

17   be appropriate.

18        THE COURT:   Let me ask you -- and maybe you're going

19   to get here -- but the factors that are listed in 3553(a)

20   include the need to protect the public from further crimes of

21   the defendant.

22        MR. KURT:   Yes, sir.

23        THE COURT:   Now, I've seen what the social worker had

24   to say, and I've seen what Dr. Forgac had to say, and they

25   suggest that he's not likely to be a recidivist; that he's not

81gQarcC

1    a pedophile or a child predator, the way those things are

2    typically defined, and it gives me some solace, I suppose.  On

3    the other hand, I don't know that anybody can predict with

4    anything approaching reasonable certainty that this conduct

5    wouldn't start again, and that Mr. Archer wouldn't be a threat

6    to children.  So address that point if you could.

7         MR. KURT:  Sure.  I agree, nobody can predict with any

8    sort of mathematical certainty.  That's the world we live in,

9    and most certainly when we're in this setting where you, your

10   Honor, is trying to figure out who this is in front of you.

11   I've worked with Mr. Archer to figure that question out for

12   myself.  Ms. Logsdon has done a lot of work with him.

13   Dr. Forgac has at some length and, clearly, yes, all we could

14   do is use our best judgment in that regard.  I guess I would

15   point out to the Court that the offense of which Mr. Archer has

16   been convicted by his own admission, the Act of Congress has

17   established that it does not carry a mandatory minimum, so,

18   most certainly, I would think that one could not conclude

19   merely by his conviction of this offense that a prison term was

20   absolutely necessary in order to protect the public.  I think

21   if the folks in Washington who had enacted the statute believed

22   that, then they would have put a mandatory minimum on this.

23        THE COURT:  I hear you on that, Mr. Kurt, but, I mean,

24   the reality is it carries a ten year maximum sentence, and

25   under the guidelines, his range is eight to ten years.  So, it

81gQarcC

1    puts him at the high end of sentences for conduct for which the

2    statute was passed, right?

3         MR. KURT:  Correct.

4         THE COURT:  So I guess I'm trying to figure out what

5    is it about this defendant and his conduct, about his

6    likelihood of recidivism or his treatment needs, etc., that

7    would differentiate him from another defendant who, under the

8    guidelines, would get a sentence like that.  And sentences like

9    that get handed down with some frequency, I understand.

10        MR. KURT:  I understand that.  Well, your Honor, I

11   would ask the Court to look at the totality of the

12   circumstances with Mr. Archer, including his age, including the

13   fact that when his home was searched and his computer was

14   searched, there was not some extensive collection of child

15   pornography found.  What was found was actually a small

16   minority of the pornography that he had had at one time on his

17   computer.

18        I pointed out to the Court in one of my submissions

19   that the investigating agent had filed an affidavit to obtain

20   the search warrant, and gave sort of her view of how people

21   with a pedophile tendency, how they keep their possessions with

22   respect to that kind of a thing, and that agent said that

23   typically such people have a collection of child pornography.

24   It's a very dear thing to them.  They hold on to it.  They

25   protect it.  They don't want to lose it.

81gQarcC

1        In contrast, in this case, it's actually quite the
2   opposite.  Mr. Archer deleted the pornography on his computer,
3   all of it, including the small amount of child pornography.  He
4   had no other child pornography in his house.  He's done nothing
5   in his lifetime that would suggest to the Court or anybody that
6   he actually has an ongoing pathological attachment to small
7   children.  In view of all that, and in view of his lack of a
8   criminal record, in view of really the breakdown -- I have to
9   use the word breakdown that he has suffered as a result of all
10  of this, I just think that it's highly, highly unlikely that he
11  will ever even consider any of this kind of conduct again.
12  It's just -- I don't see it happening.
13        THE COURT:  Talk to me, if you would, about one of the
14  other factors is the need to provide the defendant with
15  educational, vocational training, medical care or other
16  correctional treatment in the most effective manner.
17        MR. KURT:  Yes.
18        THE COURT:  There are facilities, certainly federal
19  facilities, that have pretty good programs for this kind of
20  thing.
21        MR. KURT:  I'm aware of that, your Honor.  In
22  fairness, I know the presentence report pointed out a facility
23  in Massachusetts, Devens, Massachusetts.  That's one
24  possibility.  At the same time I agree that Mr. Archer does
25  need some supervision, some treatment in that regard.  Just

81gQarcC

1    based on what the Court has before it, I think clearly that

2    would be appropriate.  I guess the question is does he need to

3    be put in prison for a lengthy amount of time to achieve that?

4    I know that in the Northwest Ohio area, as anywhere else, there

5    are treatment programs for people who have been convicted of

6    this kind of an offense, and it can be done while he's under

7    house arrest, while he's on supervised release for any length

8    of time.

9              THE COURT:  Well, is he still seeing Ms. Logsdon?

10             MR. KURT:  He is.  Frankly, your Honor, I've talked to

11   Ms. Logsdon on several occasions.  She's been working hard with

12   him.  She was very concerned about his mental well-being all

13   through these proceedings and particularly this week.  That's

14   been her focus, quite frankly.  I'm not aware that she is any

15   specialist in the treatment of sex offenders.  I believe she

16   has even told me that, but she knows of programs that are

17   available.  I know they're out there and that could be

18   accomplished by the Court as a term of supervised release.

19             THE COURT:  The other considerations that you

20   acknowledge, but we haven't talked about much, is the need to

21   impose a sentence that would reflect the seriousness of the

22   offense, to promote respect for the law, to provide a just

23   punishment for the offense, to afford adequate deterrence to

24   criminal conduct as general deterrence, not specific

25   deterrence.  And talk to me about those.  You're proposing a

81gQarcC

1    sentence of a year or so, a year or two in jail.  How do those

2    considerations, how are they satisfied by the sentence that

3    you're proposing?

4          MR. KURT:  Your Honor, I guess one of the things I

5    would point out to the Court, there's some language in the Gall

6    opinion that just kind of struck me.  I found it to be very

7    satisfying language in terms of what you as the judge is faced

8    with as a human being in imposing a sentence and what the

9    courts are faced with.  This may be a little bit strong

10   language, and I don't intend it to be that way, but the Supreme

11   Court quoted, I believe, the district judge in the Gall case as

12   saying that:  The sentence of imprisonment may work to promote

13   not respect but derision of the law if the law is viewed as

14   merely a means to dispense harsh punishment without taking into

15   account the real conduct and the circumstances involved in the

16   sentencing.

17         So I guess what I would say, your Honor, it is a very

18   serious offense.  I am aware that there are many cases, many

19   cases of egregious behavior, not that Mr. Archer's behavior was

20   not egregious at some level, but there are many cases with far

21   more evil to them, if you will, and, again, I'm speaking only

22   in mitigation, I'm not trying to excuse what he has done, and

23   these cases are all going to fall basically under this law,

24   perhaps something a little more stringent.

25         But I submit to you, your Honor, the courts are going

81gQarcC

1    to have to kind of pick and choose a little bit, and come down

2    hard on the cases where it's really truly warranted to send

3    that message.  Granted, you know, a shorter prison term rather

4    than a longer prison term sentence, obviously on the math of

5    it, sends a lesser message than a shorter prison term but that

6    doesn't mean, I don't think, that the court has to impose such

7    a Draconian sentence in every case.  I honestly don't think

8    it's necessary.  It's almost an economics thing.  It's like

9    eventually there will be the opportunity before the courts --

10   there is the opportunity, unfortunately, for the courts to send

11   this message loud and clear with lengthy prison terms.  It

12   doesn't mean it has to be every case, and it doesn't have to be

13   in this case.

14        THE COURT:  I understand that.  I've got to commend

15   you for everything you submitted.  It was very helpful.  The

16   one thing I didn't see, and it may be because there isn't much

17   out there, but other cases in this district or other districts

18   in which departures were granted or in which sentences were

19   fashioned that were lower than the guidelines for comparable

20   conduct.

21        MR. KURT:  Your Honor, I tried to find cases, and I'm

22   sure I could have spent more time, but I did try to find cases

23   in the Second Circuit that talk about the actual outcomes.

24   Unfortunately, the cases I came across tended to have a lot of

25   technical issues in them as opposed to just pure, straight-up

81gQarcC

1    sentencing issues.

2         THE COURT:  Well, it doesn't always get reported, I

3    understand that too.

4         MR. KURT:  And maybe the Court is in a better

5    position, obviously, than I am in that regard.

6         THE COURT:  Anything else you want to add with respect

7    to the fact of the 3553 factors?

8         MR. KURT:  Well, I know the Court has a tough job on

9    its hands in this case.  It's a balancing act, very clearly,

10   and I think there's more than enough here for the Court to show

11   some mercy, quite frankly.  It's an old-fashioned term, to show

12   some mercy to Mr. Archer, and another term maybe we don't hear

13   about a lot but I would like to put before the Court is the

14   question of redemption.  I believe in redemption.  I believe

15   that people can, they don't always, but they can come around to

16   facing straight up what they've done to confront what it is in

17   themselves that has led, you know, to the criminal offense and

18   everything else here and to repudiate it.  And I truly believe

19   that Mr. Archer is somebody who has done that.  And he has

20   repudiated in his own mind, to the extent that he can, what he

21   has done and wants nothing more to do with this kind of conduct

22   ever again.  I really do think that the record pretty clearly

23   reflects that.

24        Again, we're all stuck here.  We're all human beings.

25   Not one of us can get inside the head of the other.  So we can

81gQarcC

1   only go on the words we hear from a person and their action and

2   their history.   Taking all of that into account, I truly think

3   that Mr. Archer is somebody who can be redeemed.   He's seeking

4   to do that himself because he's probably harder on himself over

5   all of this in a moral sense than maybe the other people

6   involved in this case.   So I would just ask the Court to take

7   that into consideration.   He's 61-years-old.   The kind of

8   sentence that's suggested by the guidelines, quite frankly,

9   would eat up much of the rest of his life.

10          I've sat down with his wife Thora, Mrs. Archer.   This

11   is a very quiet, unassuming, gentle person.   She does rely

12   greatly on Mr. Archer; not just physically.   He does the

13   driving.   It's a very traditional home, but I sense very

14   strongly her emotional dependence on Mr. Archer in a very

15   old-fashioned way, and, frankly, in quite a pleasant way, and,

16   your Honor, I'm going to suggest to you that to take him out of

17   that home, out of that relationship for any length of time, an

18   extended length of time would be devastating to her and quite

19   expensive to the children.   They're grown children.   So, I'd

20   ask the Court to consider all of that.

21          THE COURT:   Well, I will certainly consider it, but

22   that's, unfortunately, true in many cases when a sentence is

23   imposed.

24          MR. KURT:   I understand, your Honor.

25          THE COURT:   Thank you, Mr. Kurt.   I want to hear from

81gQarcC

1    the government, then I'll want to hear from Mr. Archer.

2         Mr. Rosensaft, it seems to me that certainly your

3    submission makes clear the government's view that a substantial

4    sentence is appropriate.  I'm not clear on exactly whether the

5    government is saying that 97 to 121 months is that sentence.  I

6    know the office's policy with respect to recommendations, and

7    I'm not going to ask you to outline it, but I'm trying to make

8    sure I understand your letter in which you argue in favor of

9    substantial sentence.  You state that 97 to 121 months reflects

10   "the violent nature of these offenses and the goal of

11   protecting children from these heinous crimes."  Then you go on

12   to acknowledge that defense counsel has identified "a number of

13   mitigating factors in this case," which seems to be a

14   concession of sorts that this is an atypical case in your view.

15   Is that correct?

16        MR. ROSENSAFT:  That is correct, your Honor.  This

17   case, looking at the nature of the crime itself and the

18   circumstances of the crime, I think is particularly egregious

19   and heinous.  Looking at the defendant in terms of his lack of

20   criminal history, his age, and although we only have his own

21   words to gauge it by, his perceived remorse that he has over

22   it, I think, counterbalances that.  I can be absolutely clear

23   though that I don't think a sentence of a year in prison, for

24   instance, would be sufficient in this case.

25        First, with regards to the possession of child

81gQarcC

pornography, Mr. Kurt, I know made reference to the fact that

he attempted to delete these items, and they were actually

recovered from his hard drive.  They weren't completely erased.

I think your Honor is right.  We can't be sure how many times

he's gone through this cycle.  In fact, we know that for the

deletions he made in this case, he was scared by America Online

shutting off his account because of violating their policies.

So I don't think we can be sure whether he deleted the items

because he genuinely felt remorse at having them on his

computer or was scared of being caught and was scared that

America Online had caught him.

Now, there weren't other printed material found in his

house and the number of images was below 150.  It was not the

10,000 collection, frankly, that I've seen in some other cases.

But that's taken into account in the guidelines.  If this were

a case where there were 10,000 images, the guideline range

would be much, much higher.  In another case that the defendant

is waiting to be sentenced where he just merely possessed child

pornography, the guidelines calculation has an amount of 17

years.  So I think the guidelines range in this case does take

into account the still large, but somewhat limited, nature of

the defendant's collection in this case.

I don't want to suggest that the possession of child

pornography isn't heinous enough in and of itself because every

time someone trades these images or looks at these images, it

81gQarcC

1    re-victimizes the children again and again.  And I know from

2    other cases and from hearing from victims in other cases who

3    were even able to identify the children that have been

4    victimized that this victimizes them throughout their entire

5    lives; and knowing that people are trading them and every time

6    another copy of these images is made, it gives these children

7    anguish, extreme anguish throughout their lives.  So, I don't

8    want to suggest that that's not a heinous enough crime in and

9    of itself, but we also know in this case the defendant took the

10   extra step of contacting who he thought was a 14-year-old girl

11   trying to convince her to masturbate, even though she was

12   reluctant to, and tell him about it, and also sent her

13   pictures, not only of adult pornography, but of child

14   pornography, again, in an attempt to coerce her to masturbate

15   and tell him about it.

16        We only have evidence that he's done this once, but,

17   as your Honor pointed out, from the computer we really don't

18   know one way or the other whether this has happened before.

19   Honestly, your Honor can only make the decision based on what

20   the evidence does show; but the evidence does show that

21   Mr. Archer not only victimized these children by collecting

22   pornography and clicking on the computer, but he sought out a

23   child on the internet and actively tried to victimize a child

24   of 14 years of age.

25        And for those factors -- I understand that this is his

81gQarcC

1    first offense, and that he is 60 years old.  With regards to

2    his family life, it does seem to be a stable family life, and

3    there are a lot of mitigating factors; but to suggest that a

4    sentence of one year would be sufficient, it's a little

5    incomprehensible considering the nature of the crime, and I

6    think it must be a much more substantial sentence in this case.

7         THE COURT:  That's what I'm trying to get my arms

8    around; that neither party - and it's not a criticism - have

9    provided me much in the way of cases to see what comparable

10   defendants have received by way of departures or Draconian

11   sentences that would provide greater context for this case,

12   which I think would be useful.  Now, there may not be that much

13   out there.  These statutes are relatively new.  Prosecutions

14   for them are relatively recent, and so it takes time to

15   accumulate a record on which one can make such a judgment, but

16   I think it would be probably useful.  So I may ask you to do

17   that.

18        MR. ROSENSAFT:  We'd be happy to, your Honor.

19        THE COURT:  But, with respect to the issue of specific

20   deterrence, which is one of the factors under 3553, do you

21   share the confidence of the social worker and the psychologist

22   who evaluated Mr. Archer and have determined, or at least

23   opined, that he is not a likely recidivist and that he is not a

24   pedophile or child predator?

25        MR. ROSENSAFT:  I can say we certainly have no

81gQarcC

1    evidence that he ever met children, and I can say I'm

2    encouraged by the reports received from the psychologist in

3    that regard.   On the other hand, I also know from numerous

4    studies that have been done in this manner, and from the nature

5    of the crime itself, that the percentage of recidivism in these

6    cases is quite high.   So, I can't say I have no confidence that

7    the defendant will never do this again.   I think that in this

8    case, as opposed to a lot of cases, the report from the doctor,

9    combined with the full admittance of the defendant once he was

10   caught, does mitigate that somewhat though, and I think those

11   are mitigating factors I think in this case.

12            THE COURT:   Another factor to be considered is the

13   need for care or treatment.   So, I'd like to hear your views as

14   to whether that treatment is available in a prison setting or

15   whether it's more likely to be effective at home when

16   Mr. Archer is also supported by family members and other

17   institutions that he needs to bolster him.

18            MR. ROSENSAFT:   To be honest, your Honor, in that

19   regard, I'm not sure I can give you an informed decision.   I

20   know about the program that the probation officer referred to,

21   but I'm obviously not a doctor, and we haven't done our own

22   psychological examination of the defendant.   So I wouldn't want

23   to speak without more knowledge on the area.

24            THE COURT:   Anything else you want to add in light of

25   what Mr. Kurt said or in light of my questions?

81gQarcC

1      MR. ROSENSAFT:  I don't believe so, your Honor, but I

2  understand this is a difficult case, and we're happy to provide

3  whatever information your Honor would like.

4      THE COURT:  I'm not trying to pin you down, again,

5  Mr. Rosensaft.  You've been very clear that you think the

6  sentence recommended by Mr. Kurt is inappropriate and it

7  doesn't meet the other factors to be considerate considered

8  under 3553(a), particularly, I would think, seriousness of the

9  offense, respect for the law, just punishment, and more general

10  deterrence.  I understand those arguments.  You don't need to

11  go into them in some detail --

12      MR. ROSENSAFT:  That's correct, your Honor.

13      THE COURT:  -- but your letter, again, seems to

14  indicate that 97 months be too much.  I'm not asking you for a

15  sentencing recommendation, but, frankly, I would value your

16  thoughts as to what would be a just sentence or what would be

17  not an unjust sentence.  Maybe that's a different question.

18  Every lawyer in this room has an obligation to seek justice.  I

19  do; Mr. Kurt does; you do.  You're in the department of

20  justice, after all.  So I respect policies that offices reached

21  about not making sentencing recommendations.  On the other

22  hand, I do think no policy can bind or gag an attorney so that

23  they are standing quietly while an unjust sentence is imposed.

24  So that's what I want to get from you as to what in your view

25  would be an unjust sentence?  Do you think 97 months would be

81gQarcC

1    an unjust sentence?

2         MR. ROSENSAFT:  Frankly, your Honor, I don't.  I think

3    your Honor it would be reasonable in giving such a sentence.  I

4    know I stated this in my letter, but the way the Sentencing

5    Guidelines gets to that range is by applying a number of

6    enhancements that are aggravating factors in this case, and the

7    Sentencing Commission has looked over thousands of cases in

8    order to determine the guidelines range and try to not create

9    sentencing disparities.

10        THE COURT:  I understand that.  I guess I'm really

11   focused on the 3553 considerations which I think are different,

12   and some of which we never really got to, when the guidelines

13   were mandatory, so they may factor in very differently now post

14   Booker world.  So I take it face value what you said, you don't

15   think 97 months would be an unjust sentence.  If you did think

16   so, I would want to know that.

17        MR. ROSENSAFT:  I don't think so, your Honor.  I think

18   your Honor would be reasonable in imposing that.

19        THE COURT:  Mr. Archer, let me hear from you.  And

20   take your time.  I know this is stressful, no doubt.  But I

21   want to hear from you just anything what you think would be

22   relevant to me as I try to figure out what is the appropriate

23   sentence.  You've heard the conversation I've had with your

24   attorney and with the government's attorney, the considerations

25   that I'm obliged to consider and to give thought to.  It's very

81gQarcC

1   important to me what you have to say and what you make of the

2   situation you're in.

3        THE DEFENDANT:  First of all, your Honor, I'd just

4   like to say that this is a whole new environment for me.  You

5   know, like my attorney says the first time, that I made a

6   terrible mistake.  And I had some things jotted down, but he

7   wanted me to just speak from my heart.  But I am truly

8   remorseful.  I've never suffered over anything like this before

9   in my life.  At the onset of when I was arrested, it was so

10  traumatic that I just -- I just had a melt-down, and it was so

11  horrible.  I had no expectations of this coming or anything of

12  which was the idea on their part, but I truly, truly am sorry

13  for my terrible behavior.  And now I've hurt my family, let

14  alone myself.  This is not who I am or what I stand for, your

15  Honor.  I've been a good person for 60 years, and I just

16  recently retired with my wife.  This is not by any means how I

17  wanted to spend it.

18        As for why I did what I did, I think only a

19  professional could answer that question, but like I explained

20  to my lawyer, the only answer I could come up with was allowing

21  myself to get involved with pornography, any and all types of

22  pornography; adult is how I started with it.  It's just like a

23  drug.  You have no -- I had no intentions of harming anyone,

24  no, you know, no motive or anything.  I just got involved with

25  this pornography, and this is where it led me, and I wish to

81gQarcC

1    God it hadn't.  Without reading my paper that I wrote some

2    things down on, again, I want to tell you that I'm very, very

3    sorry for this behavior, and I'm begging you for mercy, your

4    Honor.  Thank you.

5        THE COURT:  Thank you, Mr. Archer.  I know that was

6    not easy.  My biggest concerns or the concerns I have to

7    satisfy myself on are, first and foremost, and we've talked

8    about you, and I think certainly you've led a law-abiding life

9    - more than that - a life in which you have been a reliable and

10   productive member of society.  And I credit that.  Certainly,

11   everything that's been submitted to the Court reveals that; not

12   just that you held a job, but that you were emotionally and

13   financially and in every way supportive of your family members

14   and your community.  I think that's clear.  I don't think

15   there's any dispute about that.

16       I've also -- you know, I take to heart what the

17   psychiatrist, psychologist, and social worker have to say about

18   the likelihood of recidivism and whether they would or, in this

19   case, Dr. Forgac would, identify you as someone who is a

20   pedophile or child predator.  He seems to argue against that in

21   the negative.  I saw that, and so it gives me some solace.

22       On the other hand, I think the foremost concern of the

23   Court is the protection of children, and so those are the

24   factors that we haven't talked much about, but those are the

25   factors that relate to respect for law, for general deterrence,

81gQarcC

1    so that your sentence and the sentence imposed in cases like

2    this may deter others from engaging in this kind of conduct and

3    victimizing the people who are victimized because this is not a

4    victimless crime.

5          Those are the things that I have to weigh and we

6    haven't talked as much about today, but I think in many ways

7    they are the first and foremost consideration of the Court in a

8    community and a society.

9          So, counsel, this may not be satisfying to you, but in

10   light of just everything you've told me, I would like to put

11   over the sentencing so I can reflect on what Mr. Archer had to

12   say, what counsel had to say, and to the extent that there are

13   additional submissions you would like to make with respect to

14   other sentences of other defendants, that would give some

15   context to this case.  In the case of the government, the

16   quality or lack of quality of a federal program in

17   Massachusetts or elsewhere, I think those are relevant

18   considerations under 3553(a).  I will say I have no great

19   desires to see the images in this case, but I think I may need

20   to given the seriousness of the conduct and the offense.  I

21   have not seen them, so I guess I think I probably should before

22   I impose sentence.

23         So, what I'd like to do is put this over for a couple

24   of weeks, as much as a month.  Mr. Archer is on bail.

25   Mr. Archer, I'm sure in some ways you hoped to resolve this

81gQarcC

1  today one way or the other.  It must be a strain to be waiting.

2  I respect that, but I think it can only be to your benefit to

3  give me more time to think about this.  So, unless there's an

4  objection, I'd like to put this over.  Mr. Kurt?

5      MR. KURT:  Your Honor, no objection at all.  I very

6  much appreciate the Court's reasoning and thinking in that

7  regard.  We'd be happy to put it over.  I think in light of the

8  concerns that the Court has raised and the matters that are

9  important to the Court, we would be happy to make further

10  submission and try and get you some answers.  I guess the tough

11  thing about finding other cases, it's really not just the post

12  Booker world, which is, what, I think only about two and a half

13  years, but it's the post Gall world -- in the Second Circuit is

14  not quite the same.  In the Sixth Circuit where I generally

15  practice, the Court of Appeals was using the standard that was

16  rejected in Gall.  I don't think the Second Circuit has been

17  using that, but, nonetheless, I think the very recentness of

18  that holding is going to make it a little difficult to find

19  meaningful cases to compare it to, but I'll be glad to do my

20  best.

21      THE COURT:  I don't expect that there's going to be a

22  mother-load of cases.

23      MR. KURT:  Sure.

24      THE COURT:  But there may be some that are worth

25  bringing to the Court's attention.  They may be distinguishable

81gQarcC

1    and they may not be particularly relevant or it may be that the

2    judges didn't consider the things that I would consider, but I

3    think more information and more precedent wouldn't be a bad

4    thing.

5             MR. KURT:  No objection.

6             THE COURT:  Mr. Rosensaft?

7             MR. ROSENSAFT:  No objection from the government, your

8    Honor.

9             THE COURT:  Mr. Archer, is that all right with you?

10            MR. KURT:  Yes, sir.

11            THE COURT:  I know it's an expense to come back here

12   as well, but under these circumstances, considering I did not

13   take your plea, and I did not preside over any of your prior

14   appearances, I also think it's important that I have time to

15   reflect on what you said and what I observed here today.

16            THE DEFENDANT:  I appreciate that, your Honor.

17            THE COURT:  Between two weeks and a month.

18   February 15 or thereabouts, is that all right?

19            MR. KURT:  I know that February 15 is a good day.  If

20   possible, if you have something early in the afternoon.

21            THE COURT:  That way you can do it the same day?

22            MR. KURT:  Coming in and out the same day.  Maybe the

23   morning would be a little easier.

24            THE COURT:  We'll work around you.  I understand.

25            THE DEPUTY CLERK:  Is a different day easier?

81gQarcC

 1          THE COURT:  Sort of midday is best?

 2          MR. KURT:  Early afternoon.

 3          MR. ROSENSAFT:  Your Honor, I am actually going to be

 4    tied up in the afternoon.  I can find someone to cover.

 5          THE COURT:  No.  I want you here, Mr. Rosensaft.

 6          THE DEPUTY CLERK:  The 19th.

 7          THE COURT:  The 19th, would that work?

 8          MR. ROSENSAFT:  Yes, sir.

 9          MR. KURT:  Yes.

10          THE COURT:  What time?  Afternoon is preferable,

11    right?

12          MR. KURT:  Yes.

13          THE COURT:  2:15?

14          MR. KURT:  That's fine.

15          THE COURT:  You don't have to submit anything, but if

16    you have things you'd like to submit, that would be helpful.  I

17    don't think we need to recover ground we've covered today.  I

18    want to assure you I've read everything you've sent.  I've read

19    all the letters more than once.  I don't think additional

20    letters are necessary.  I don't think the points we've covered

21    today with respect to remorse and family circumstances and

22    those kind of things, I don't think they're really in dispute.

23    So let's do that.  Thank you, all.

24          MR. KURT:  Thank you very much, your Honor.

25          THE COURT:  I apologize for my voice.  Next time you

81gQarcC

1     won't recognize me.   Thanks again.

2              MR. ROSENSAFT:   Thank you, your Honor.

3              (Adjourned)